IN THE UNITED STATES DISTRICT COURT
FOR EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No. 1:26-MJ-300 |
| PATRICK STEVEN YAROCH, | |
| *Defendant.* | |

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since January 2026. As a Special Agent, I have received training at the FBI Academy located in Quantico, Virginia, including training on investigative methods and training specific to counterintelligence and espionage investigations. I am currently assigned to a squad at the FBI Washington Field Office, Counterintelligence Division, where I primarily investigate counterintelligence, mishandling, and espionage matters. I am also familiar with the methods used by individuals engaged in the unlawful use or disclosure of classified information.  I have also received training on cryptocurrency.

2.      During my career with the FBI, I have conducted or participated in witness and subject interviews, the execution of search and arrest warrants, the seizure of evidence, including

1

computer and electronic evidence, as well as requested and reviewed pertinent records. Based on my experience and training, I am familiar with the requirements for the handling of classified documents and proprietary government information.

3.    The facts in this affidavit come from my personal observations, my training and experience, information obtained from other law enforcement agents (foreign and domestic) and witnesses, and information obtained through legal process. This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all my knowledge about this matter.

4.    This affidavit is submitted in support of a criminal complaint charging PATRICK STEVEN YAROCH (YAROCH) with interstate transportation of stolen goods, securities, and monies, in violation of 18 U.S.C. § 2314, and receipt of stolen goods, securities and monies, in violation of 18 U.S.C. § 2315.

**BACKGROUND ON YAROCH**

5.    From approximately February 2025 to July 31, 2026, YAROCH was an FBI Supervisory Special Agent who worked at FBI Headquarters (FBIHQ) Counterintelligence and Espionage Division (CED). YAROCH was also a detailee within the US Intelligence Community. As a detailee, YAROCH worked at a secure non-FBI building located in Northern Virginia approximately four times a week and spent one day a week working at FBIHQ. YAROCH resides in Ashburn, Virginia. From approximately 2017-2025, YAROCH worked at the FBI Boston Division (FBI BS). While assigned to FBI BS, YAROCH worked on a national security investigative squad focused on ADVERSARIAL NATION STATE 1. Since May 2017, YAROCH

2

held a TOP SECRET security clearance with sensitive compartmented information (SCI) access. On July 29, 2026, FBIHQ placed YAROCH on administrative leave. On July 31, 2026, the FBI terminated YAROCH's employment.

## INVESTIGATION OVERVIEW

### YAROCH Self-Reports to DOJ and FBI

6.      At approximately 2:38 PM on July 31, 2026, Department of Justice (DOJ) Office of Inspector General (OIG) and FBI Washington Field Office (FBI WF) conducted a voluntary interview of a DOJ National Security Division (NSD) employee (DOJ EMPLOYEE 1). From the interview, law enforcement learned the following:

7.      During the afternoon of July 28, 2026, YAROCH contacted DOJ EMPLOYEE 1 via Signal and requested to meet to discuss personal matters. DOJ EMPLOYEE 1 and YAROCH previously worked together while YAROCH worked at FBI BS. DOJ EMPLOYEE 1 and YAROCH met at approximately 12:00 PM on July 29, 2026, at FBIHQ. Upon meeting DOJ EMPLOYEE 1 at FBIHQ, YAROCH immediately started to break down as he told his story. DOJ EMPLOYEE 1 suggested they move the meeting to his office at Robert F. Kennedy Department of Justice Building. At approximately 1:30 PM, DOJ EMPLOYEE 1 and YAROCH continued the conversation.

8.      YAROCH told DOJ EMPLOYEE 1 that he made some very poor decisions related to cryptocurrency wallets. YAROCH said that he went into FBI systems and found keys needed to transfer money from wallets to himself. YAROCH began this activity in late 2024 or early 2025 while assigned to FBI BS. YAROCH investigated an individual from ADVERSERIAL NATION 1 and became frustrated when he could not do more to disrupt this individual's use of

3

cryptocurrency. YAROCH conducted transfers approximately 10-12 times. YAROCH did not know how much money was involved because it was co-mingled with his other personal assets, including capital gains, but it was under a million dollars.

9.      YAROCH decided to tell DOJ EMPLOYEE 1 about his actions because of the shame and he knew what he did was wrong. YAROCH said it was "eating him up inside," and he wanted to "get it off his chest." YAROCH inquired about criminal exposure. DOJ EMPLOYEE 1 instructed YAROCH that it was very serious, he should get a lawyer, and self-report immediately. YAROCH wanted to do everything he could to make it right, including giving all the money back.

10.     At approximately 3:57 PM on July 29, 2026, YAROCH contacted FBIHQ and requested an in-person meeting. Minutes later, FBIHQ personnel met with YAROCH, who appeared to be distraught. During the meeting, YAROCH told FBIHQ personnel he wanted to disclose something because "he screwed up." Approximately 30 minutes prior to the meeting, YAROCH submitted an online self-report regarding the situation to FBI Security Division (FBI SecD). On July 30, 2026, FBI WF Agents interviewed the FBIHQ SSA that encountered YAROCH on July 29, 2026. The contents of that interview which are described in the paragraphs below explain what YAROCH told the FBIHQ during the meeting.

11.     According to the FBIHQ SSA, prior to working for FBIHQ, YAROCH previously was assigned to an FBI field office and investigated counterintelligence matters regarding ADVERSERIAL NATION 1. In approximately November 2024, during his investigative work, YAROCH was exposed to adversarial cryptocurrency accounts. At this point, YAROCH described himself as "spinning out of control." YAROCH claimed he was frustrated that the FBI could not or would not act against adversarial cryptocurrency accounts.

12.     According to YAROCH, he researched cryptocurrency and learned that a passphrase[1] is needed to take funds out of an account. YAROCH created a personal cryptocurrency wallet. YAROCH searched FBI holdings for information on adversarial cryptocurrency accounts. YAROCH memorized the passphrases from adversarial accounts. YAROCH decided to "take matters into his own hands" and transferred funds from the adversarial cryptocurrency accounts to his personal wallet. YAROCH conducted these transfers approximately 10 times into the same cryptocurrency wallet. The value of YAROCH's wallet was approximately one million dollars. YAROCH did not transfer or use the funds; they remained in the wallet. According to YAROCH, he never interacted with anyone associated with the adversarial accounts, including foreign entities. FBIHQ advised YAROCH not to touch the wallet.

**Attempted FBI WF Interview of YAROCH**

13.     At approximately 9:18 PM on July 29, 2026, FBIHQ and FBI WF personnel arrived at YAROCH's residence located in Ashburn, Virginia (RESIDENCE), to place YAROCH on administrative leave and to collect FBI property. YAROCH consensually brought FBI Agents to an upstairs bedroom located at the RESIDENCE. YAROCH obtained his FBI credentials to return to FBI personnel. Before turning in his credentials, YAROCH pulled out a piece of paper,

---

[1] Based on my training and what I have learned from other law enforcement officials, I believe that YAROCH is using the term passphrase incorrectly here and that he is actually referring to a seed phrase. A seed phrase unlocks a wallet, but a passphrase is a separate security measure. If you enter the seed phrase and the passphrase you get entirely different addresses derived from the same seed phrase but only accessible if you use the seed plus passphrase. A passphrase can be a single word, multiple words, or an alphanumeric combination, while a seed phrase is generally multiple words long. Specifically, seed phrases are generally 12, 15, 20, or 24 words long.

5

approximately 3x5 inches, from his credentials and explained it contained key words/phrases for his cryptocurrency wallet(s). YAROCH asked the Agents if they wanted the paper. FBI Agents confirmed that YAROCH consented to providing the paper and they took possession of it at approximately 9:25 PM.

14.     At approximately 9:45pm on July 29, 2026, FBI WF and DOJ/OIG Agents attempted to interview YAROCH at the RESIDENCE. YAROCH spontaneously told the interviewing Agents, " I fucked up." FBI WF Agents advised YAROCH of his Miranda rights verbally and in writing using a FD-395 Advice of Rights form. YAROCH indicated he understood his rights by signing the form. FBI WF Agents read YAROCH the FD-644 Warning and assurance to Employee Requested to Provide Information on a Voluntary Basis. Following a discussion of *Garrity* and the differences between administrative and criminal inquiries, YAROCH declined to continue with the interview. YAROCH stated that he wanted to consult an attorney before he met with the FBI WF Agents.

15.     At approximately 9:59 PM, YAROCH withdrew consent for the paper that appeared to have the seed phrase, or other key terms or phrases associated with the cryptocurrency wallet.  YAROCH asked the FBI WF SSA with the paper to return it to him. FBI WF SSA obliged YAROCH's request and returned the paper to him.

16.     YAROCH then initiated contact with an FBI WF Agent who attempted to interview him on July 29, 2026. From the afternoon of July 30, 2026, to the morning of July 31, 2026, YAROCH and the FBI WF Agent exchanged the following text messages:

YAROCH to FBI WF Agent: …it's Patrick. Taking today to step away. I'll be in touch with you towards the end of the day to set something up if that works for you.

FBI WF AGENT to YAROCH: Hi, Patrick – thanks for letting me know. Sounds like a plan. I'm at my desk so please call there if I don't answer my cell.

YAROCH to FBI WF Agent: Does Monday or Tuesday afternoon work for you?

FBI WF AGENT to YAROCH: Thanks for reaching out. Can we meet tomorrow? We could meet at WFO or our RA[2] in Manassas.

YAROCH to FBI WF Agent: We can be tentative for manassas in the afternoon. I have been trying to get a proper attorney consult but need just a bit more time. I'll do my best to get that sorted in the AM and keep you posted.

FBI WF AGENT to YAROCH: I was hoping to meet with you at 10am. Can you please let me know by 8:30am if you can meet at that time in Manassas?

YAROCH to FBI WF Agent: I don't think I will be able to get a consult scheduled prior to 10am. I do want to be fully cooperative but I also need at least some legal guidance before proceeding. I just need one more day.

---

[2] In this context, RA means Residential Agency.

FBI WF AGENT to YAROCH: Good morning, Patrick. Understood. Thanks for getting back to me.

**FBI Search Warrant for YAROCH's Person, Residence, and Vehicle**

17.     On the evening of July 30, 2026, United States Magistrate Judge William B. Porter authorized search warrants for YAROCH's person, residence and vehicle.

18.     At approximately 10:47 AM on July 31, 2026, FBI WF executed the search warrants on YAROCH's person, residence, and vehicle. At that time, YAROCH was alone in the RESIDENCE. FBI WF Agents informed YAROCH that he was temporarily detained pending FBI WF Agents securing the scene at the RESIDENCE by FBI WF SWAT.

19.     Once the scene was secured by FBI WF SWAT, at approximately 11:00 AM, FBI WF and DOJ/OIG Agents moved YAROCH into the RESIDENCE and removed the handcuffs. FBI WF Agents informed YAROCH he was not under arrest at that time, and free to depart the RESIDENCE; however, he could not take his vehicle. YAROCH stated he would stay at RESIDENCE throughout the duration of the search. FBI WF Agents emphasized respecting YAROCH's right to an attorney and that any statements YAROCH makes would be voluntary. YAROCH stated he had planned to recontact the FBI the next week, either Monday, August 3 or Tuesday, August 4 after consulting an attorney. YAROCH agreed to cooperate by identifying items of interest sought by the FBI under the court authorized search warrant. To be clear, YAROCH had not retained an attorney at the time of the execution of the search warrants.

20.     YAROCH confirmed that the cellular phone on the stairs of RESIDENCE was his phone. YAROCH explained he had a shared Apple computer with his wife that syncs with his

iPhone. There was also an older model laptop that was also shared with YAROCH's wife. YAROCH stated that he still had the paper he had originally handed to FBI WF SSA on the evening of July 29, 2026, with the cryptocurrency wallet key words/phrases.

**Seized Items**

21.     In accordance with the search warrants, FBI WF seized the following items from the RESIDENCE:

    a.  iPhone 17 Pro, SN DX2M9KX24D, which YAROCH stated was his cellular phone;

    b.  Mac desktop computer, SN GYF67NXYQV;

    c.  Asus laptop, model UX305L;

    d.  TREZOR original hardware wallet, in possible sealed original packaging;

    e.  Black LG cell phone, no visible SN

    f.  One US personal passport issued to Patrick Yaroch bearing passport number A78349209,  one US diplomatic passport issued to Patrick Yaroch bearing passport number X00146919, and one US personal passport issued to Patrick Yaroch bearing passport number 553230512;

    g.  Two sheets of paper, power of attorney dated 15 June 2026; and

    h.  Small piece of paper with handwritten presumed cryptocurrency seed phrases written on it, which YAROCH directed FBI WF Agents to this slip of paper at the beginning of the search. The slip of paper was the same paper YAROCH

temporarily consented to provide FBI Agents on July 29, 2026, but later withdrew his consent.

**Preliminary Review of YAROCH's Phone**

22.    During the execution of the search warrant FBI WF Agents located YAROCH's iPhone 17 Pro in the RESIDENCE. YAROCH confirmed it was his cellular phone. YAROCH reviewed the search warrant, which included the retrieval of biometrics, and obliged FBI WF Agents to open the phone with Face ID and he also voluntarily provided the pin.

*Cryptocurrency on YAROCH's Phone*

23.    FBI WF Agents asked YAROCH about his cryptocurrency account location. YAROCH explained that he accessed his cryptocurrency via the Kraken application (KRAKEN). YAROCH told FBI WF Agents that he only used KRAKEN on his phone to access his cryptocurrency accounts. YAROCH could not recall if he accessed any of these accounts on another computer or device. YAROCH stated he commingled personal funds and the stolen funds into the same cryptocurrency wallet on KRAKEN. YAROCH was the only one with access to the wallet. YAROCH's phone and Apple computer were both logged into his iCloud account and were synced.

24.    YAROCH voluntarily presented his face as the unlock mechanism to KRAKEN. YAROCH did not know of a username or password to log into KRAKEN; he accessed it through his phone and used Face ID to sign in. FBI WF reviewed YAROCH's KRAKEN. Upon opening KRAKEN, the total account balance was approximately $188,570.58 (This balance, and all future

10

numbers herein, are subject to change as the market price for cryptocurrency fluctuates). Approximately 17,987.64 was in US Dollar Coin (USDC) and 165,582.49 was in US Dollars (USD). The remaining amount was split between Squid (QUID) (equivalent of 4,998.59 USD), Bitcoin (BTC) (equivalent of 1.67 USD), and three other currencies with a balance of less than $0.02. The payment method used for KRAKEN deposits and withdrawals was a TD bank account ending in 8558. The KRACKEN account email address had YAROCH's name in the address, and the account number ended in PH2Q.

25. FBI WF Agents inquired if YAROCH used any other cryptocurrency applications on his phone. FBI WF Agents inquired about this because FBI WF Agents were able to see that YAROCH had transferred cryptocurrencies from his wallet to another wallet and another unknown service. Specifically, FBI WF Agents saw that on or around July 23, 2026, YAROCH transferred approximately $1.02 million to the unknown service. From the interview of YAROCH, WF FBI Agents learned that the unknown service was a "Suilend" (SUILEND) account.

26. YAROCH explained that he had also previously used the Slush application (SLUSH) on his phone to manage some of his money but had deleted the application. FBI WF Agents, with YAROCH's consent, redownloaded SLUSH on YAROCH's phone. Upon opening SLUSH, YAROCH explained how to locate the funds. YAROCH connected an external account called SUILEND and loaded the money into that account using a 12-word seed phrase. YAROCH explained he did this as it was a place to store the money and accrue interest. YAROCH clarified that he did not send or transfer any money from one of his other accounts into SUILEND, rather created the account via SLUSH and brought in the funds by entering the seed phrase. YAROCH stated he chose this service simply because he liked that the logo was a water droplet.

11

27.    A preliminary review of SUILEND from within SLUSH showed a total balance of 933,756.73 USD, of which 933,691.54 USD was invested, and 65.19 USD was in the account wallet and was not invested.

28.    At approximately 3:20 PM on July 31, 2026, YAROCH voluntarily signed a consent to seize property form which allowed FBI WF Agents and the FBI WF cryptocurrency team to transfer money from multiple wallets and cryptocurrency accounts that were controlled by YAROCH. FBI WF transferred the funds contained within the KRAKEN and SLUSH accounts to US government (USG) controlled cryptocurrency wallets. FBI WF cryptocurrency team used seed phrases located during the search of the RESIDENCE to conduct the transfers. The total value of all transferred funds was approximately 925,426.07 USD. Following the transfers by FBI WF, approximately 165,582.49 USD remained in YAROCH's KRAKEN. The funds remain available for trade as they were unable to be transferred to a USG controlled cryptocurrency wallet because the funds were in USD. A receipt for property form was completed and signed for the above transactions that transferred funds from YAROCH's cryptocurrency wallets to USG controlled accounts with the account numbers, cryptocurrency amounts, and approximate USD value.

*ChatGPT Searches on YAROCH's Phone*

29.    The display name on the ChatGPT application on YAROCH's phone was "Patrick Yaroch."

30.    At 6:04 PM on May 28, 2026, YAROCH asked ChatGPT, "If I had a million dollars, how would you suggest investing it/spending it to maximize profit and return." ChatGPT responded, "At 37, with a young family, a goal of potentially retiring around 40, and a clear

interest in eventually building a slower-living vineyard/agricultural lifestyle in places like Cilento or Portugal's Dão region…"

31.     At 8:35 AM on June 4, 2026, YAROCH asked ChatGPT, "If you had a bucket of money (around $1 million) and you wanted to leave the USA and become a resident or citizen of an EU country, what would you do?" ChatGPT responded, "Given everything you've told me – [name of YAROCH's child], your wife, the desire for a 2-5 hectare estate, interest in age-worthy red wine, and the goal of actually living there rather than just owning a property- I would not start by chasing citizenship…What I would do with $1 million Option 1: Portugal (my top choice for your specific situation)."

32.     At 10:33 PM on June 17, 2026, YAROCH asked ChatGPT, "If I'm an American connecting in turkey, do I need a visa?"

33.     At 5:07 PM on June 26, 2026, YAROCH told ChatGPT, "I am trying to draft an email to low level executive management. They have a job opening I am interested in and applied to. I've been working with his admin to try and set up a call to talk about the position and life in Greece but haven't heard from him yet. I'd like to follow up with an email directly to him…"

*Planned Travel to Portugal*

34.     A preliminary review of YAROCH's phone revealed a TAP Air Portugal application. Within the application, FBI Agents located an upcoming trip from the United States to Portugal (record locator YML3WP). The passengers on the itinerary included YAROCH, his wife, and their child. The flight would depart Washington, DC on September 3, 2026, and would

13

arrive in Lisbon on September 4, 2026. The same day, a continuing flight was booked from Lisbon to Porto, Portugal. On September 11, 2026, a return flight was booked from Porto to Lisbon, Portugal, with an end destination of Washington, DC.

35.    On July 31, 2026, YAROCH told FBI WF Agents that his family planned a trip to Portugal in September. They planned to meet friends in Portugal. YAROCH realized he may not be able to travel anymore, but hoped his wife and child would still go on the trip.

## Power of Attorney Documents

36.    During the search of the RESIDENCE, FBI WF Agents located documents related to power-of-attorney for YAROCH and his wife dated June 15, 2026. YAROCH's document provided power-of-attorney to two lawyers in Portugal "with the power to sub-delegate, the broadest powers permitted by law,  as well as special and necessary powers to represent him before the Portuguese Tax and Customs Authority (AT), and to register him and obtain his tax identification number in Portugal, as well as to request and collect, in person, the password to access the finance portal, and to carry out all other acts that they deem necessary to fulfill their mandate."

## Unreported Foreign Travel

37.    On July 31, 2026, FBI SecD provided FBI WF with information regarding YAROCH's foreign travel. According to FBI SecD, YAROCH conducted unreported foreign travel on at least two occasions in 2026. On May 14, 2026, YAROCH traveled from Washington, DC to Germany and did not report it to the FBI, which is a security requirement. On

14

May 25, 2026, YAROCH returned to Washington, DC from Portugal, and did not report it. From June 30-July 5, 2026, YAROCH traveled to Grenada and did not report it.

38.     FBI WF Agents mentioned to YAROCH that they located the power of attorney forms for Portugal. YAROCH stated he was not planning to funnel money into Portugal. YAROCH told FBI WF Agents that his family had a trip planned to Portugal in September 2026 to meet friends. YAROCH realized he might not be able to attend the trip but stated he hoped his wife and child would still go on the trip.

**Probable Cause Arrest of YAROCH**

39.     At approximately 4:43 PM on July 31, 2026, FBI WF conducted a PC arrest of YAROCH at the RESIDENCE, following the successful transfer of the cryptocurrency from YAROCH's wallets to USG controlled accounts. FBI WF Agents verbally provided YAROCH with his Miranda rights. YAROCH verbally stated that he understood his rights. At approximately 4:59 PM, FBI WF Agents transported YAROCH to Alexandria Detention Center in Alexandria, Virginia.

40.     From the facts explained above, there is probable cause to believe that violations of 18 U.S.C. §§ 2314 and 2315 occurred. Specifically, YAROCH told others that he stole the cryptocurrency. The execution of the search warrant confirmed that YAROCH possessed the cryptocurrency within the Eastern District of Virginia. Based on the electronic nature of cryptocurrency, YAROCH would have had to have used interstate wires to conduct this theft and receive the cryptocurrency from foreign adversary wallets. Furthermore, YAROCH conducted additional transfers of the cryptocurrency after he received it and was based in the Eastern District

15

of Virginia. By the nature of his physical location at an FBI office and his possession of the cryptocurrency today in Virginia, by his admission, and the location of wallets and blockchain all over the peer-to-peer network, he would have had to have transported or received the cryptocurrency in interstate or foreign commerce.

Respectfully Submitted,

_____/s/ Hope Vance_____
Hope Vance
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me by reliable
electronic means pursuant to Federal Rule of
Criminal Procedure 4.1 on August 1, 2026:

_____
The Honorable William B. Porter
United States Magistrate Judge

16