IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA

v.

Case No. 1:26-MJ-300

PATRICK STEVEN YAROCH

*Defendant*.

**UNITED STATES' MOTION FOR REVOCATION OF
RELEASE ORDER AND REVIEW OF DETENTION**

Pursuant to 18 U.S.C. § 3145(a)(1), the United States moves this Court for a review of the Order of Release for defendant Patrick Steven Yaroch entered by Magistrate Judge Lindsey R. Vaala on August 5, 2026 (the release order). The United States also moves for a revocation of the release order or in the alternative, for additional conditions to be added to the release order. The United States further requests that the release order be stayed until the District Court can rule on this motion.[1]

As articulated in greater detail in the affidavit submitted in support of the criminal complaint against the defendant, this matter arose from the defendant's misuse of classified information to steal approximately one million dollars in cryptocurrency. To put it mildly, the defendant was only able to commit this offense because of his work as an FBI agent and his decision to abuse the trust placed in him multiple times. During his FBI employment and execution of the crimes, the defendant held a Top-Secret security clearance with sensitive compartmented (SCI) access. By the nature of his supervisory position with the FBI, he had access to highly

---

[1] The release order is currently stayed until Friday, August 7, 2026 at 2 pm. ECF 15. The government respectfully requests that the Court extend this stay if the Court needs more time to consider this motion.

sensitive and classified information. The release of such information could endanger the security of the United States.

Thus, based on the history and characteristics of the defendant, the nature and seriousness of the charges in the criminal complaint, and the defendant's ties to Portugal, the defendant poses a serious risk of flight and a danger to the community and there is no combination of conditions that will reasonably assure his presence at future proceedings or the safety of the community. Thus, the release order in this case should be revoked, or at the very least amended to add additional, more stringent release conditions.

**<u>PROCEDURAL HISTORY</u>**

The government executed a search warrant, approved by Magistrate Judge William Porter, on July 31, 2026. The defendant was arrested after the execution of the search warrant. A criminal complaint was approved by Magistrate Judge William Porter on August 1, 2026. The complaint charges the defendant, Patrick Yaroch, with two counts. He is charged in Count One with interstate transportation of stolen goods, monies, and securities, in violation of 18 U.S.C. § 2314, and in Count Two with receipt of stolen goods, monies and securities, in violation of 21 U.S.C. § 2315.

The defendant made his initial appearance before this Court on August 3, 2026. ECF 5. The defendant was temporarily detained pending his detention hearing set for August 4, 2026. *Id*. A detention hearing was held in the Eastern District of Virginia before this Court on August 4, 2026. ECF 11-12.

The United States called Special Agent Hope Vance to testify during the detention hearing and entered Special Agent Vance's affidavit that accompanied the complaint into evidence. Special Agent Vance also testified that the defendant had failed to report two foreign trips to the FBI this

year, maintained access to additional liquid assets that were not secured by the government, namely approximately $160,000 (USD not cryptocurrency) in a Kraken account, and used FBI databases to conduct unauthorized searches in cases that he was not assigned to work on. Judge Vaala asked whether the defendant had reported his foreign travel to the other agency that he was detailed to within the U.S. intelligence community and asked pretrial services to evaluate the defendant's parents as potential third-party custodians.[2] The detention hearing was adjourned and continued to the next day. *See id.*

During the August 5, 2026 detention hearing, the government informed Judge Vaala that the agency performed a search and determined that the defendant had reported one of his personal foreign travel trips to Grenada. However, the agency search did not find a report for the defendant's May 2026 trip in which he flew to Germany and then returned to the U.S. from Portugal.[3] An addendum to the bond report was also discussed in which pretrial services also found the defendant's parents competent to serve as third-party custodians. The bond report also mentioned that the defendant's parents would also be willing to move into the defendant's residence as part of their third-party custodian role.

At the hearing the government reiterated its request for detention. The defense counsel stated that the defendant would agree to abide by the conditions recommended by pretrial services and other additional conditions if his wife was allowed to serve as the third-party custodian,

---

[2] Pretrial services had not recommended a third-party custodian as a condition of his release but had evaluated the suitability of the defendant's wife as a potential third-party custodian in the bond report. The government objected to the defendant's wife arguing that she was ill-equipped to serve as the third-party custodian. Notably, the offense conduct occurred while the defendant and his wife were married and residing together. Moreover, the spouse had plans to travel to Portugal, which is the location where the defendant had a Power of Attorney and appeared to be planning to buy a vineyard with the cryptocurrency proceeds.

[3] This May 2026 foreign travel was also not reported to the FBI.

including (1) home confinement with allowances for the defendant to attend medical and legal appointments in addition to transporting his child to his parents' house; (2) location monitoring via electronic/GPS monitoring; and (3) not to associate with members of the intelligence community unless he was given approval by pretrial services.[4]

Following the hearing, Judge Vaala ordered the defendant released with conditions and issued a written Order of Release. ECF 16. These conditions included standard conditions of release and the conditions recommended by pretrial services. The Court also imposed the following additional conditions:

1. Allow his passport to remain within the possession of the FBI;

2. Not to depart the Washington D.C. metropolitan area without prior approval of pretrial services or the Court;

3. Refrain from having any contact with potential witnesses related to the instant offense unless in the presence of counsel;

4. Not to possess or access a firearm or other weapons or destructive devices;

5. Released to the custody of his parents, who will serve as third-party custodians and reside with the defendant at his current residence;

6. Cancel any reservations/tickets for upcoming travel and provide written confirmation to pretrial services;

7. Not to open any new lines of credit, loans, or bank accounts without prior approval of pretrial services or the Court;

8. Provide pretrial services access to all financial records as requested;

---

[4] Defense counsel also informed the Court that the defendant's wife and child had also voluntarily relinquished their passports to defense counsel's possession.

9. Refrain from having any contact with anyone you know or believe to be agent of a foreign government;

10. Notifying any future employer (during release) of the charged offense as deemed necessary by pretrial services;

11. Refrain from possessing or having access to a computer or the internet unless a computer monitoring program has been installed by pretrial services. The defendant shall consent to the installation of computer monitoring software on any computer which the defendant has access. Installation shall be performed by Pretrial Services. The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, internet use history, email correspondence, and chat conversations. The defendant shall not remove, tamper with, reverse engineer, or in any way circumvent the software. The cost of the monitoring will be paid by the defendant

12. Refrain from possessing or utilizing any video gaming system and console, phones with internet capabilities, or other such devices which would enable contact and/or sharing of data with other individuals known or unknown to the defendant

13. Released on a secured bond, $50,000, cash or surety co-signed by a third party custodians- to be finalized by 2:00pm on Friday August 2, 2026.

The government then moved for a stay of the release order as it sought an appeal to the District Court. Judge Vaala stayed the release order until Friday, August 7, 2026 at 2 pm. ECF 15.

The United States appeals to this Court, as the court of original jurisdiction over the offense, requesting a reversal of the August 5, 2026, Order of Release (ECF No. 16), and further requesting that the Order of Release be stayed until the District Judge assigned to this matter has an opportunity to rule on this motion.

## REVIEW OF DETENTION BY THE DISTRICT COURT

The government seeks review of the Magistrate Judge's Order of Release ruling pursuant to 18 U.S.C. § 3145(a)(1). This provision provides that a court with "original jurisdiction over the offense" may review the release order of a magistrate judge. 18 U.S.C. § 3145(a)(1). On review, the district judge acts *de novo* and makes an independent determination of the proper pretrial detention or conditions for release based on evidence presented to the magistrate judge and on additional evidence adduced before the district judge. *See United States v. Clark*, 865 F.2d 1433, 1436 (4th Cir. 1989); *see also United States v. Fortna*, 769 F.2d 243 (5th Cir. 1985). Although the Court must make an independent determination of the proper pretrial detention or conditions of release, *see United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001); *Clark*, 865 F2d 1433, 1436 (4th Cir. 1989), it may incorporate into its analysis any evidence or reasons relied on by the magistrate judge, *see United States v. Hanson*, 613 F. Supp. 2d 85, 88 (D.D.C. 2009), and it is free to utilize the record of the proceedings before the magistrate judge, *see United Sates v. Marra*, 165 F. Supp. 2d 478, 481 (W.D.N.Y. 2001); *United States v. Cole*, 715 F. Supp. 677 (E.D. Pa. 1988).

## LAW APPLICABLE TO DETENTION

The defendant should be detained because there is no condition or combination of conditions that will reasonably assure his appearance and reasonably assure the safety of any other person and the community. In order to secure the defendant's detention, the government must prove by a preponderance of the evidence that the defendant is flight risk. *See Stewart*, 19 F. App'x at 48. Alternatively, the government may also prove that the poses a risk of harm to any person or the community by clear and convincing evidence, *see* 18 U.S.C. § 3142(f)(2)(B). "For pretrial detention to be imposed on a defendant, the lack of reasonable assurance of either the defendant's

6

appearance or the safety of others or the community, is sufficient; both are not required." *Stewart*, 19 F. App'x at 48.

"Detention hearings are an informal proceeding, and the evidence presented is not governed by the Federal Rules of Evidence." *United States v. Duncan*, 897 F. Supp. 688, 690 (N.D.N.Y. 1988); 18 U.S.C. § 3142(f)(2). The government may proceed in a detention hearing by way of proffer. *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C.Cir.1996) (per curiam) (citing *United States v. Gaviria*, 828 F.2d 667, 669 (11th Cir. 1987); *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986); *United States v. Acevedo-Ramos*, 755 F.2d 203, 206-07 (1st Cir. 1985)).

In determining whether there are conditions of release that will reasonably assure the defendant's appearance as required and that will protect the safety of the community, the Court must consider: (1) "the nature and circumstances of the offense charged," including whether the offense is a "crime of violence"; (2) "the weight of the evidence against" the defendant; (3) "the history and characteristics of" the defendant, including but not limited to, the defendant's character, past conduct, and criminal history; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by" the defendant's release. 18 U.S.C. § 3142(g).

## **BASIS FOR DETENTION**

### *Risk of Flight*

The defendant is both a flight risk and a danger to the community, both of which warrant detention in this case. The strength of the evidence, the penalties at play, his attempt to purchase property in Portugal, all give a strong incentive for nonappearance that no conditions can address sufficiently with this sophisticated defendant.

Foreign travel, lack of community ties, lack of trustworthiness, and an incentive to flee can constitute preponderant evidence of a risk of flight. *See, e.g., United States v. Mallory*, 268 F. Supp. 3d 854, 864–65 (E.D. Va. 2017) (despite home ownership in district, defendant ordered detained because underwater on the house, foreign travel and contacts, and no incentive to stay); *United States v. Karmann,* 471 F. Supp. 1021, 1022 (C.D. Cal. 1979) (ordering detention on the basis that *"the Court concludes that the defendant by reason of his conduct has made a mockery of the income tax laws and the regulations issued thereunder and has indicated he will continue to do so in defiance of the law"*).

The evidence that law enforcement uncovered during the execution of the search warrant shows that the defendant was taking steps to build a life in Portugal. Specifically, he traveled to Portugal after he stole the cryptocurrency, arranged to travel to Portugal again in September, and repeatedly asked ChatGPT questions about his desire to live abroad.  The defendant also failed to report his May 2026 travel to the FBI or his detailee agency. Notably, for this 10-day trip, the defendant flew into Germany and then returned to the U.S. from Portugal. From the airline records discussed in the affidavit, the defendant was gone for approximately 10 days during the May 2026 unreported trip. Ten days is a significant amount of time and serious questions persist regarding the details of that international trip. Alarmingly, this unreported international trip occurred during the middle of the defendant's criminal conduct. The defendant also executed power-of-attorney documents for lawyers in Portugal to purchase property on his behalf because the defendant was interested in purchasing a winery in Portugal.  Thus, the fact that the defendant chose not to report foreign travel to Portugal, the country he appeared to be interested in buying property in, is significant. Moreover, defendant reported his foreign travel to at least one of the agencies he worked for both before and after the May 2026 Portugal trip. He clearly knew the rules regarding

8

reporting foreign travel and chose not to abide by them. Because of his position with the FBI, the defendant knew the importance of reporting foreign travel but chose not to report the May 2026 Portugal trip.

<u>**18 U.S.C. § 3142(g) FACTORS ANALYSIS**</u>

The defendant poses a continuing danger to the community. By the nature of his position with the FBI and detail to an agency within the U.S. intelligence community, he had access to highly specialized and secret information. As discussed earlier in this motion, the defendant has already shown that he is willing to misuse classified information to enrich himself. This conduct is significant and sets him apart from others who merely mishandle classified information.

The defendant's ability to harm society if he continued to misuse classified information and state secrets to enrich himself while on pretrial release cannot be overstated. *Cf. Mallory*, 268 F. Supp. 3d at 865 ("the defendant possesses sensitive information – state secrets that, based on the evidence presented, defendant is willing to divulge – that could cause harm to . . . to the United States as a whole.") To be clear, the government does not have evidence that the defendant divulged classified information to third parties at this time – unlike Mallory who faced 18 U.S.C. § 794 charges. Thus, it appears that the defendant's conduct is much less serious than Mallory's conduct. However, the rationale behind the *Mallory* opinion is still instructive to this Court because it shows that this Court has found defendants can serve as a danger to the community when they possess sensitive information that could harm America's interests if they were disclosed and have previously shown to misuse that information in ways to enrich themselves.

The defendant's criminal conduct has the potential to cause serious international consequences that could potentially affect the rest of society whether by continuing to steal from the adversary nations' wallets or by misusing the classified information in other ways.

The execution of the charged offenses required a high degree of skill and planning. First, it should be noted that the very nature, any theft of cryptocurrency is sophisticated. This is even more true here because the charged conduct involves a theft from international wallets. As the defendant stole from adversarial nations' wallets, the charged offenses were only able to occur because the defendant had access to sensitive and classified information. He misused that information to steal the cryptocurrency. Stated in other words, he misused his access to classified information to enrich himself.

The defendant has argued that he has been completely cooperative with law enforcement during this investigation, but the reality of the defendant's cooperation is complicated and more limited than that. While the defendant has been cooperative with law enforcement at times, at other times he has chosen not to cooperate. As the complaint's supporting affidavit explains in detail, the defendant was initially cooperative with law enforcement when it appeared that he was facing an administrative proceeding. However, his behavior changed when it became clear that the defendant was also facing a criminal investigation. Notably, the defendant initially agreed to give law enforcement a piece of paper that he claimed contained the key words/phrases needed to access his cryptocurrency wallet.[5] However, after receiving his *Miranda* rights and a *Garrity* warning, the defendant asked for that paper back. This prompted law enforcement to get a search warrant to find this paper as it tried to recover the stolen cryptocurrency.

Although the defendant initially claimed that he stole this cryptocurrency out of frustration, he should not be viewed as a selfless Robin Hoodesque figure. The evidence is clear that the

---

[5] This document appears to be a seed phrase.

10

defendant planned to use this cryptocurrency for his own personal enrichment, just like any other fraudster. The defendant planned to purchase property related to a vineyard in Portugal. As detailed in the affidavit attached to the complaint, the defendant asked ChatGPT, "If you had a bucket of money (around $1 million) and you wanted to leave the USA and become a resident or citizen of an EU country, what would you do?" ChatGPT responded, "Given everything you've told me – [name of YAROCH's child], your wife, the desire for a 2-5 hectare estate, interest in age-worthy red wine, and the goal of actually living there rather than just owning a property- I would not start by chasing citizenship…What I would do with $1 million Option 1: Portugal (my top choice for your specific situation)."

Moreover, during the execution of the search warrant when law enforcement went to retrieve the cryptocurrency it was not in the initial cryptocurrency wallet they had been led to. Instead, it was law enforcement officials who discovered that a sizable $1.02 million transfer had occurred out of that wallet and into an unknown service. It was only after law enforcement independently discovered this transfer that the defendant informed them that this unknown service was a Suilend account. It was then that Yaroch explained that he had previously used the Slush application on his phone to manage some of the money but had deleted the application. Law enforcement, with the defendant's consent, redownloaded the Slush application to his phone. Upon opening the Slush application, the defendant explained how to locate the cryptocurrency.

Yaroch is a very sophisticated defendant. The criminal conduct described in the affidavit required a great deal of planning and precise in its execution. Moreover, "[d]efendant's profession and skills point strongly to the conclusion that he could flee, evade capture, and circumvent even the most stringent pretrial conditions." *Mallory*, 268 F. Supp. at 864. As a former special agent, he knows the databases and systems that the government uses to track individuals' flights and

movements. He is familiar with customs and border norms in ways that many are not. As other fugitive cases have shown, criminal defendants are still sometimes able to escape and evade detection even after being placed on electronic monitoring. Of all the defendants that appear before this Court, Yaroch is among the most capable of evading his pretrial release supervision and fleeing from justice. The defendant therefore poses a serious risk of flight and should be detained.

### *Weight of the Evidence*

The evidence against the defendant is very strong and 18 U.S.C. § 3142(g)(2) directs the Court to consider the weight of the evidence when determining if release is appropriate. As District Courts in this Circuit have noted, this factor is weighed equally among the other factors. *See United States v. Mitchell*, 1:23-cr-175, Dkt. No. 27, at 8 (E.D. Va. Aug. 23, 2023) ("This Court joins with the only other district judge within this Circuit that appears to have addressed the issue [of the weight of the factor] and will consider this factor and weigh it equally along with all of the other factors."); *United States v. Shaheed*, 455 F. Supp. 3d 225, 232 (D. Md. 2020) ("Here, the Court considers [the strength factor] and weighs it along with the other Bail Reform Act factors.").

The defendant confessed to stealing the cryptocurrency from the adverse nations' wallets. During the investigation, law enforcement has learned of numerous incriminating admissions made by the defendant regarding the charged offenses to multiple different individuals, law enforcement has corroborated the defendant's incriminating statements through other evidence gathered in its investigation, including through the seizure of the cryptocurrency and discovering what information he was could access through his work with the FBI and the other agency. The defendant's searches across the FBI's database are also strong evidence of his intent and the meticulous planning and preparation that went into these offenses.

12

The defendant has been charged with two felonies that carry a maximum penalty of 10 years of incarceration each and he is facing a guideline range of at least 41 to 51 months.[6] *See United States v. Duranseau*, 26 F.3d 804, 808 (8th Cir. 1994); *United States v. Melguizo*, 824 F.2d 370, 371 (5th Cir. 1987) (both the Eighth and Fifth Circuits finding that possible sentences of ten years are sufficient to indicate that the offense is serious). Furthermore, the defendant may face charges at Indictment that carry much stiffer penalties, including violations of 18 U.S.C. § 793.

Based on what the defendant himself has admitted to – stealing cryptocurrency from an adverse nation's wallet – it is not an unreasonable inference to believe that the classified information he abused and retained (the seed phrases) was also national defense information. A violation of 18 U.S.C. § 793 carries a base offense level of 30, which carries a greatly increased guideline range of around 10 years. Although the defendant is not charged with an 18 U.S.C. § 793 offense at this time, the Court should still consider the penalties associated with this charge because future additional charges can also give the defendant an incentive to flee. *See e.g., United States v. Underwood*, 1:11-cr-261. There, Underwood was initially arrested on an indictment solely charging allegations of false statements in violation of 18 U.S.C. § 1001. *Id.* at Doc. 3. He was granted bond. However, likely realizing that he could face more serious charges in the future, Underwood fled once released on bond. *See id.* at Sept. 21, 2011 and Sept. 23, 2011 Minute Entries. Authorities later apprehended Underwood and he was charged with attempted violations of 18

---

[6] This is a conservative calculation of his guidelines range is subject to change later. This guideline range calculation is based on the following assumptions: that the defendant is found to be in a criminal history category I, is sentenced under the U.S.S.G.'s 2B1.1 section, with a base offense level of 6 and 14-level increase to reflect a loss amount of around a million dollars. This calculation also accounted for a 2-level increase for a sophisticated means enhancement, another 2-level increase from the application of an abuse of trust enhancement and a 2-level deduction for the defendant's zero-point offender status.

U.S.C. § 794. Thus, the *Underwood* case serves as a cautionary tale of defendants who flee because they know they may face more serious charges in the future.

In short, the weight of the evidence for both Count One and Count Two are very strong and the detention factor listed in 18 U.S.C. § 3142(g)(2) therefore heavily favors detention of the defendant. This overwhelming evidence also provides an increased incentive for the defendant to flee to avoid prosecution if he is released.

### *Danger to the Community*

Next, the Court must consider the nature and seriousness of the danger to any person of the community that would be posed by the person's release. 18 U.S.C. § 3142(g)(4). In this case, this factor weighs strongly in favor of detention. As argued above, the defendant had access to very sensitive and classified information. He still knows some of this information and has shown that he is vulnerable to misusing this secret information for his own personal gain. Even if the Court does not view this as constituting clear and convincing evidence that the defendant presents a danger to the community, it should weigh this information heavily in its analysis of the 3142 factors. As such, the 18 U.S.C. § 3142(g) factors weigh in favor of detention.

### *No Condition or Combination of Conditions of Release Will Meaningfully Reduce the Risk of Harm to the Community and the Serious Risk of Flight*

The conditions of release contained in the Order of Release do not mitigate the serious risk of flight. First, a third-party custodian, without other conditions, is unlikely to be able to ensure that a sophisticated such as the defendant will not flee. While the defendant's passports are confiscated, it should be noted that the defendant does not have to flee internationally to flee from court proceedings. He simply needs to evade law enforcement and move somewhere else within

the country. Moreover, crossing into Mexico or Canada can be physically done even without documents.

Moreover, as third-party custodians, the defendant's parents will have perfectly "understandable" and "protective impulses" and "bias" that impinge on their ability to serve as third-party custodians. *United States v. Richardson*, 4:17-cr-77, 2020 WL 6471201, at *4 (E.D. Va. Nov. 3, 2020). Even if the defendant's parents are committed to reporting his flight as soon as they learn of it, these third-party custodians would still have to learn about the defendant's flight in a timely manner to inform law enforcement. Although the government posits that location monitoring is not enough,[7] it would still provide the government with quicker and more reliable notice of this sophisticated defendant's flight rather than a mere third-party custodian. Similarly, while home confinement is not enough, that condition in connection with a third-party custodian and electronic monitoring would also help the government pinpoint the defendant's location and be in a better position to apprehend the defendant if he does flee.

The government has met its burden in demonstrating that the defendant is both a flight risk and a danger to the community. The government is aware of the recommendation of Pretrial Services for release with conditions, but that recommendation is based upon a Pretrial Risk Assessment ("PTRA") that is incapable of properly addressing this defendant given his history and the nature of his charges in this case. Simply put, the PTRA is of extremely limited use in assessing

---

[7] As other courts have recognized "location monitoring is inadequate because ankle monitors can be removed and ensure only a reduced head start should a defendant decide to flee." *United States v. Wang*, No. 23 CR. 118-3 (AT), 2023 WL 4551637, at *3 (S.D.N.Y. July 14, 2023) (citing *United States v. Freeman*, No. 21 Cr. 88 (S.D.N.Y.), Bail Hr'g 5:4-6, Feb. 19, 2021. ECF No. 50 ("Anyone who knows the technology of electronic monitoring knows that it is far from foolproof."), *and United States v. Zarger*, No. 00 Cr. 773, 2000 WL 1134364, at *1 (E.D.N.Y. Aug. 4, 2000) (stating that electronic monitoring "at best ... limits a fleeing defendant's head start")). As such, location monitoring merely provides notice of, and does little to prevent, flight of a defendant.

the risk posed by the defendant because the tool is based on larger data aggregates rather than a truly detailed and individualized assessment of the individual.

## **CONCLUSION**

For the foregoing reasons, the defendant should be detained pending trial. Accordingly, the United States respectfully requests stay the release of the defendant until this Court can rule on this motion.

Were the Court to disagree with the government's position as articulated herein, it is respectfully requested that the following additional conditions of release be imposed: (1) that the defendant be subject to home confinement with exceptions for legal and medical appointments and the ability to transport his child to his parents' house or to daycare; (2) the defendant be subjected to location monitoring via electronic/GPS monitoring; and (3) the defendant is only allowed to socialize with members of the intelligence community with the approval of pretrial services.

Respectfully submitted,

TODD W. BLANCHE
Acting Attorney General

THEOPHANI K. STAMOS
First Assistant United States Attorney

By:    _____/s/_____
Kathleen E. Robeson
Russell Carlberg
Assistant United States Attorneys

16

**CERTIFICATE OF SERVICE**

I hereby certify that on August 7, 2026, I filed the foregoing document with the Clerk of Court. I further certify that I will forward an electronic copy of the foregoing document to defendant's counsel of record in this case and to the United States Probation Office.

_____/s/_____

Kathleen E. Robeson
Assistant United States Attorney
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3700
Fax: (703) 299-3982
Kathleen.robeson@usdoj.gov